**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISA MARTIN | ) | CASE NO.: |
| 8409 Superior Avenue | ) | |
| Cleveland, Ohio, 44103 | ) | JUDGE |
| | ) | |
| -and- | ) | |
| | ) | **COMPLAINT FOR DAMAGES** |
| SHELDON ROBINSON JR. | ) | |
| 1759 Catalpa Road | ) | |
| Cleveland, Ohio, 44112 | ) | **(Jury Demand Endorsed Herein)** |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| INPAX SHIPPING SOLUTIONS INC | ) | |
| C/O Leonard Wright | ) | |
| 2444 Forrest Park Rd SE, | ) | |
| Atlanta, Georgia, 30315 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| INSS, LLC | ) | |
| C/O Leonard Wright | ) | |
| 2444 Forrest Park Rd SE, | ) | |
| Atlanta, Georgia 30315 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| INPAX FINAL MILE DELIVERY INC. | ) | |
| C/O Leonard Wright | ) | |
| 2444 Forrest Park Rd SE, | ) | |
| Atlanta, Georgia 30315 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| COREY JACKSON | ) | |
| 2406 Greenway Dr, | ) | |
| Decatur, GA 30035 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

1

|                          |     |
|--------------------------|-----|
| -and-                    | )   |
|                          | )   |
| LEONARD WRIGHT           | )   |
| 150 Newfield Drive,      | )   |
| Tyrone, Georgia, 30290   | )   |
|                          | )   |
| Defendants.              | )   |

Plaintiffs, Melisa Martin and Sheldon Robinson, by and through undersigned counsel, as their Complaint against Defendants, state and aver the following:

## PARTIES
### (Plaintiffs)

1. Martin is an individual residing in Cuyahoga County, Ohio.

2. Robinson Jr. ("Robinson") is an individual residing in Cuyahoga County, Ohio.

### (Inpax Defendants)

3. Inpax Shipping Solutions, Inc., ("Inpax") is a for-profit corporation organized under the laws of the State of Georgia, and who, at all times referenced herein, maintained offices in Cincinnati, Ohio and operated in Ohio.

4. INSS, LLC is a for-profit corporation organized under the laws of the State of Ohio, and who at all times referenced herein, maintained offices in Cincinnati, Ohio and operated in Ohio.

5. Inpax Final Mile Delivery, Inc. ("Inpax Final Mile") is a for-profit corporation organized under the laws of the State of Georgia and whom, at all times referenced herein, operated in Ohio.

6. Inpax, INSS, and Inpax Final Mile are hereinafter referred to collectively as the "Inpax Defendants"

7. At all times referenced herein, Inpax Defendants jointly exercised control over the employment of Martin and Robinson.

2

8. At all times referenced herein, Inpax Defendants jointly had the power to hire and fire Martin and Robinson.

9. At all times referenced herein, Inpax Defendants jointly supervised the schedules of Martin and Robinson.

10. At all times referenced herein, Defendants jointly determined how Martin and Robinson would be paid.

11. At all times referenced herein, Defendants jointly maintained employment records for Martin and Robinson.

12. Upon information and belief, Inpax Defendants all maintain their principal offices at same location, 2444 Forrest Park Rd SE, Atlanta, Georgia 30315.

13. Upon information and belief, Inpax Defendants are all controlled by Inpax's president, owner, and CEO, Leonard Wright.

14. At all times referenced herein, Inpax Defendants jointly employed Martin and Robinson and constituted an employer within the meaning of Section 3(d) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d); Article II, Section 34a of the Ohio Constitution; and the Ohio Minimum Fair Wages Standards Act ("OMFWSA").

## (Individual Defendants).

15. Upon information and belief, Wright is a resident of Georgia.

16. Wright is and was at all times referenced herein the president, owner, and/or Chief Executive Officer of Inpax Defendants.

17. At all times referenced herein, Wright supervised and/or controlled Martin and Robinson's employment with the Inpax Defendants, controlled the day to day operations of the Inpax Defendants, to include their compensation policies and practices, and acted directly or

3

indirectly in the interest of the Inpax Defendants in relation to their employees, and was an employer within the meaning of section 3(d) of the FLSA; Article II, Section 34a of the Ohio Constitution; and the Ohio Minimum Fair Wages Standards Act ("OMFWSA").

18. At all times referenced herein, Jackson was as District Manager for Inpax.

19. At all times referenced herein, Jackson supervised and/or controlled Martin and Robinson's employment with the Inpax Defendants, controlled the day to day operations of the Inpax Defendants, to include their compensation policies and practices, and acted directly or indirectly in the interest of the Inpax Defendants in relation to their employees, and was an employer within the meaning of section 3(d) of the FLSA; Article II, Section 34a of the Ohio Constitution; and the Ohio Minimum Fair Wages Standards Act ("OMFWSA").

## PERSONAL JURISDICTION

20. Defendants hire citizens of the state of Ohio, contract with companies in Ohio, and own or rent property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports with due process.

21. Martin and Robinson performed work in this judicial district, were paid unlawfully by Defendants pursuant to work performed in this district and/or were hired out of this district.

22. This cause of action arose from or relates to the contacts of Defendants with Ohio residents, thereby conferring specific jurisdiction over Defendants.

## SUBJECT MATTER JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

24. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims derive from a common nucleus of operative facts.

4

25.   Venue is proper in this District because Defendants did a sizeable portion of their business in this District at all times referenced herein, and many of the wrongs herein alleged occurred in this District.

## COVERAGE

26.   At all times referenced herein, Inpax Defendants formed a single enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r); and formed a single enterprise engaged in commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise at all times hereinafter mentioned had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that enterprise had an annual gross volume of sales made or business done of not less than $500,000.00.

27.   At all times material to the Complaint, Martin and Robinson directly participated in the actual movement of things in interstate commerce by regularly using instrumentalities of interstate commerce in their work, namely by regularly and recurrently delivering Amazon.com packages from outside of Ohio to customers homes and businesses in Ohio.

## FACTS
### (Background Facts Concerning Inpax Defendants).

28.   At all times referenced herein, Inpax Defendants operated an Amazon delivery service.

29.   At all times referenced herein, Inpax Defendants received packages ordered by end-users from Amazon.com and then distributed those packages locally to their intended recipients via Delivery Drivers and/or "Delivery Associates," ("Driver") who operated vans and trucks maintained owned and maintained by Inpax Defendants.

30. At all times referenced herein, the Drivers employed by Inpax Defendants did not cross state lines while performing their deliveries and could not reasonably be expected to be called upon to perform deliveries outside of the state they resided in.

31. At all times referenced herein, the vehicles operated by Drivers had a gross vehicle weight of under 10,000 Lbs.

32. At all times referenced herein, Inpax Defendants operated out of an Amazon Fulfillment Center located in Euclid, Ohio.

**(Facts Concerning Plaintiff Martin).**

33. Martin was initially hired by Inpax Defendants as a Driver on or about October 16, 2018.

34. As a Driver, Martin was paid an hourly wage of $10.00 per hour plus a weekly, non-discretionary bonus known as a "GMR" bonus.

35. Martin's hours were recorded via a paper sign-in sheet that was maintained by her supervisors.

36. Martin's managers would then take the information contained on the sign-in sheets and input it into an electronic device or computer.

37. At all times referenced herein while Martin was working for Defendants as a Driver, Martin could not clock in or out freely; instead, Martin had to find a manager who had access to the sign in sheets.

38. At all times referenced herein while Martin was working for Defendants as a Driver, she was not paid for all hours she worked each day.

39. Martin would typically arrive at Inpax each morning at around 7:00am to 7:30am.

40. Martin was required to report to the Inpax "hub" located at the Amazon Fulfillment center, where she would be given keys to a vehicle; Martin would then retrieve the vehicle from a

parking lot located across the street, drive it back to the Amazon Fulfillment center, and load her vehicle ("Morning Work").

41. The Morning Work typically took an hour, or slightly longer, to complete.

42. Defendants did not always include the Morning Work performed by Martin in her recorded hours of work.

43. Upon information and belief, Defendants did not include all hours reflected on Martin's sign in sheets in her pay.

44. From time to time, Drivers would be unable to finish their delivery routes.

45. When a Drivers was unable to finish their delivery route, Inpax would ask other Drivers to perform a "rescue" by meeting the other Driver and completing a portion of their remaining deliveries.

46. Defendants promised Drivers that they would be paid a bonus for agreeing to perform rescues.

47. Defendants promised Drivers that they would be paid a bonus for agreeing to work extra shifts.

48. When Drivers received a bonus for performing a rescue, it appeared on their paystub as "Bonus2."

49. The Bonus2 payment, having been explicitly promised in exchange for performing rescues, was non-discretionary and therefore was required to be included in the calculation of the regular rate of pay for the purpose of calculating the proper overtime rate. See 29 CFR §§ 778.208; 778.211(c).

50. During her employment with Defendants, Martin performed rescues.

51. During her employment with Defendants, Martin performed other task requested of her for which she was promised a bonus, such as coming in to work an additional route.

52. Defendants did not include the Bonus2 payments Martin received in the calculation of the overtime paid to Martin, in violation of the FLSA and the OMFWSA.

53. On occasion, Drivers such as Martin would still be out on the road when they were asked to perform a rescue.

54. Upon information and belief, Drivers remained "on the clock" when they performed rescues that they had been assigned while still out on the road, prior to returning to the "hub."

55. From time to time, Martin would be asked to perform rescues after she had already returned to the "hub" and signed out.

56. Upon information and belief, Defendants did not always include the hours Martin spent performing rescues after she had already returned to the "hub" in Martin's recorded hours of work.

57. In or around December of 2018, Martin was promoted to a scheduling position ("First Promotion.")

58. Martin continued to perform Driver duties after her First Promotion.

59. Martin split her time working for Defendants between her new scheduling duties and her Driver responsibilities during December of 2018 and January of 2019.

60. Martin continued to be paid on an hourly basis after she became a scheduler.

61. In or around January of 2019, Martin was advised that she would be promoted to the position of General Manager for the Euclid, Ohio location.

62. Martin would be paid a salary as General Manager.

63. Martin was promoted to General Manager in mid-February, 2019.

64. Martin was promoted to General Manager because of her strong work performance for Defendants.

65. Defendants would not have promoted Martin if she had a history of poor performance.

66. As the General Manager, Martin was responsible for submitting the hours contained on time sheets to Inpax.

67. As the General Manager, Martin observed that the hours she submitted to Inpax would be routinely be "taken out" of the system by Inpax.

68. As the General Manager, Martin observed that the hours contained on the sign on sheets she submitted did not match the hours employees were eventually paid for.

69. As the General Manager, Martin observed that at times, entire days Drivers had worked would not be included in the time Drivers were paid for.

70. As the General Manager, Martin observed that employees working for Inpax at different locations in the United States were being included on her payroll.

71. As the General Manager, Martin observed that certain drivers in Euclid had not been paid a bonus for all rescues and had not been paid for the time spent performing those rescues.

72. In late February, 2019, Martin travelled to Inpax's headquarters in Atlanta, Georgia for a General Managers meeting ("February Meeting").

73. Jackson and Wright participated in the February Meeting, along with Inpax's Human Resources/ Head of Operations, Skarlet Baez.

74. During the February Meeting, Martin complained about the various pay issues in Euclid.

75. Martin complained that Drivers were not getting all of their promised rescue bonuses and were not being paid hourly to perform the rescues.

76. Martin complained that some Drivers were performing rescues "for free."

77. Martin complained that the hours that were being recorded on the sign on sheets were not being paid to Drivers.

78. Martin complained that some Drivers were not getting paid for all the days they worked.

79. In response to Martin's complaints, Beaz told Martin that the group would "get to discussing those issues" later in the meeting.

80. Despite Beaz's promise that Martin's complaints would be addressed, the group did not return to discussing Martin's complaints before adjourning the meeting.

81. After the February Meeting concluded, Martin attempted to speak with another human resources employee at Inpax, Chelsea Wright, about Martin's concerns regarding how Drivers in Euclid were being paid.

82. Chelsea Wright is Wright's daughter.

83. Chelsea Wright told Martin she would need to speak with Brittany Stuckey about Martin's concerns regarding how Drivers in Euclid were being paid.

84. Upon information and belief, Stuckey is also Wright's daughter.

85. Upon information and belief, Stuckey handled payroll for Inpax.

86. Subsequently, Martin spoke with Stuckey about her concerns regarding how Drivers in Euclid were being paid.

87. Stuckey told Martin that she would need to discuss her concerns regarding how Drivers in Euclid were being paid with Wright.

88. Subsequently, Martin spoke with Wright regarding how Drivers in Euclid were being paid.

89. Wright told Martin he would "handle" her concerns about how Drivers in Euclid were being paid.

90. Martin returned to Euclid the day following the February Meeting.

91. Martin did not hear back from Wright or anyone else she had spoken with in Georgia about her concerns about how Drivers in Euclid were being paid.

92. Subsequently, on March 8, 2020, Martin made another complaint by email about how Drivers in Euclid were being paid ("March 8, 2019 Email").

93. Martin addressed the March 8, 2019 Email to Wright, Jackson, Stuckey, Baez, David Williams, and Douglas Jacke.

94. In the March 8, 2020 Email, Martin complained that Drivers had still not had their pay corrected and she detailed her efforts to correct time their time records.

95. In the March 8, 2020 Email, Martin complained about ongoing issues with the hours she was reporting for Drivers and for herself not being correct on checks:

> FOR INSTANCE, OF THE NEWEST 3 IN TWO OF THEIR CASES IN TIME CLOCK HAS ALL CORRECT HRS, HOWEVER, FOR EXAMPLE: AN EMPLOYEE HAD 36 HRS IN TIME CLOCK AND ONLY 16 HRS PAID ON THEIR CHECKS? I DO NOT PRINT CHECKS? I ALSO HAVE A PAY WAGE ADJUSTMENT THAT WAS NOT CORRECTLY ADJUSTED IN PAYCHECK ALONG WITH ANOTHER I SENT IN AND HOW LONG BEFORE MY WAGE CORRECTION WAS PROCESSED FOR DRIVER'S PAYMENT? AGAIN, NOT DCL-1 AT FAULT? THEIR WERE MANY ISSUES DATED BACK FROM OCTOBER INCLUDING MY OWN PAYCHECKS BEFORE I WAS PLACED IN THE POSITION AND AFTER, THAT I HAVE NOT YET EVEN BEGAN TO PUT IN WRITING. **Including being placed on salary after working over 80 hours twice in 2 weeks**

96. The following week, Jackson travelled to Euclid, Ohio, and appeared at Martin's office without prior notice.

97. Martin was surprised to see Jackson.

98. Jackson told Martin he was there to help her with the pay issues she had been complaining about.

99. Jackson ordered Martin to pack all of her paper sign in sheets and other documents related to the hours Drivers had worked in boxes so he could take them to Georgia.

100. Martin complied with Jackson's instructions.

101. Jackson began to relieve Martin from various aspects of her job duties under the pretext of "helping you out a little."

102. After spending several days in Euclid, Jackson left the Euclid Inpax with several boxed documents and told Martin he would return the following Monday or Tuesday.

103. On March 18, 2019, Jackson flew back to Cleveland.

104. Jackson arrived at the Euclid Inpax at approximately 3:00pm.

105. Jackson immediately terminated Martin when he arrived at the Euclid Inpax.

106. Jackson did not provide Martin with any specific reason for her termination, other than to say that "sometimes there is a business reason for letting someone go, sometimes it is personal, this is personal."

107. Upon information and belief, Jackson and Wright made the decision to terminate Martin.

108. Defendants lack a legitimate, non-retaliatory reason for having terminated Martin.

109. Defendants terminated Martin because of her complaints in February and March of 2018 about Drivers not being paid for all hours worked.

110. As a result of Defendants' unlawful conduct, Martin has suffered and continues to suffer damages.

**(Facts Concerning Plaintiff Robinson).**

111. Robinson was initially hired by Inpax Defendants as a Driver on or about November 15, 2018.

112. As a Driver, Martin was paid an hourly wage of $9.33 per hour plus a weekly, non-discretionary bonus known as a "GMR" bonus.

113. Robinson's hours were recorded via a paper sign-in sheet that was maintained by his supervisors.

114. Robinson's managers would then take the information contained on the sign-in sheets and input it into an electronic device or computer.

115. At all times referenced herein while Robinson was working for Defendants as a Driver, Robinson could not clock in or out freely; instead, Robinson had to find a manager who had access to the sign in sheets.

116. Robinson was required to report to the Inpax "hub" located at the Amazon Fulfillment center, where he would be given keys to a vehicle; Robinson would then retrieve the vehicle from a parking lot located across the street, drive it back to the Amazon Fulfillment center, and load her vehicle ("Morning Work").

117. The Morning Work typically took an hour, or slightly longer, to complete.

118. Defendants did not always include the Morning Work performed by Robinson in his recorded hours of work.

119. Jackson and/or Inpax dispatch would regularly send Robinson text messages to let him know when he need to be at work the next day.

13

120. Robinson regularly appeared at work at the time Jackson and/or dispatch told him to be there.

121. If Robinson was running late, he would text Jackson or dispatch to let them know.

122. Upon information and belief, Defendants did not include all hours reflected on Robinson's sign in sheets in his pay.

123. For example, on December 5, 2018, Jackson told Robinson he was scheduled to work at 8:30am on December 6, 2018:



124. Robinson appeared at Inpax to work at 8:30am on December 6, 2018.

125. Robinson signed in when he appeared at work at 8:30am on December 6, 2018.

126. At approximately 10:06am on December 6, 2018, Jackson requested that Robinson send him a picture of his gas card.

127. Robinson sent Jackson a picture of his gas card moments after getting Jackson's 10:06am request:



128. Despite the fact that Robinson had been at work at 8:30am on December 6, 2018, Inpax only recorded his hours that day from 12:16pm through 2:54pm:

Sheldon Robinson   Location: DCL1 - CLEVELAND

| | | | | | |
|---|---|---|---|---|---|
| [ Sun | 11/18 | 08:00 AM | 11/18 | 11:00 AM | 110 |
| [ Tue | 11/20 | 08:00 AM | 11/20 | 03:00 PM | 110 |
| [ Wed | 11/21 | 08:00 AM | 11/21 | 06:22 PM | 110 |
| [ Fri | 11/23 | 08:30 AM | 11/23 | 05:00 PM | 110 |
| [ Tue | 11/27 | 08:30 AM | 11/27 | 05:15 PM | 110 |
| [ Thu | 11/29 | 09:00 AM | 11/29 | 03:48 PM | 110 |
| [ Mon | 12/3 | 08:30 AM | 12/3 | 10:00 AM | 110 |
| [ Wed | 12/5 | 08:27 AM | 12/5 | 05:06 PM | 110 |
| [ Thu | 12/6 | 12:16 PM | 12/6 | 02:54 PM | 110 |

129. On December 8, 2018, Jackson sent Robinson a group text message in which he stated that Robinson and other Drivers were scheduled to work at 8:30am on December 9, 2018.

130. Robinson appeared to work at Inpax at 8:30am on December 9, 2018.

131. Despite the fact that Robinson had been at work at 8:30am on December 9, 2018, Inpax only recorded his hours that day from 8:52am through 4:05pm:

| | | | | | |
|---|---|---|---|---|---|
| [ Sun | 12/9 | 08:52 AM | 12/9 | 04:05 PM | 110 |

132. On January 3, 2019, Jackson told Robinson that he was scheduled to work on January 4, 2019, at 8:15am.

133. Robinson reported to work at Inpax at 8:15am on January 4, 2019.

134. Despite the fact that Robinson had reported to work at 8:15am on January 4, 2019, Inpax only recorded his hours that day from 8:56am to 7:29pm:

| | | | | | |
|---|---|---|---|---|---|
| [ Thu | 1/3 | 08:31 AM | 1/3 | 05:00 PM | 110 |
| [ Fri | 1/4 | 08:56 AM | 1/4 | 07:29 PM | 110 |

135. As evidenced by the below text messages between Jackson and Robinson, Robinson worked
on January 5, 2019:



136. Robinson worked until approximately 7:30pm on January 5, 2019.

137. Despite the fact that Robinson had worked on January 5, 2019, Inpax did not include the
hours Robinson worked that day in his recorded hours of work:

| | | | | | |
|---|---|---|---|---|---|
| [ Thu | 1/3 | 08:31 AM | 1/3 | 03:00 PM | 110 |
| [ Fri | 1/4 | 08:56 AM | 1/4 | 07:29 PM | 110 |
| | | | | | |
| [ Mon | 1/7 | 08:30 AM | 1/7 | 06:30 PM | 110 |
| [ T | 1/8 | 08:30 AM | 1/8 | 06:30 PM | 110 |

138. Robinson was not paid at all for the hours he worked on January 5, 2019.

139. As evidenced by Jackson's text message to Robinson on February 7, 2019, Robinson was
scheduled to work on February 8, 2019:

140. Robinson worked on February 8, 2019 from approximately 8:00am to 6:30pm.

16

141.  Inpax failed to include the hours worked by Robinson on February 8, 2019 in his recorded

hours of work:

| [ Tue | 2/5 | 08:00 AM | 2/5 | 10:00 AM 1 |
| [ Wed | 2/6 | 08:00 AM | 2/6 | 11:30 AM 1 |
| | | | | |
| [ Wed | 2/13 | 08:00 AM | 2/13 | 11:30 AM 1 |

142.  Robinson worked on February 12 and 14, 2019.

143.  Inpax did not pay Robinson for the work he performed on February 12, 14, 2019:

| [ Wed | 2/13 | 08:00 AM | 2/13 | 11:30 AM 1 |
| [ Fri | 2/15 | 08:00 AM | 2/15 | 03:53 PM 110 |

144.  Subsequently, Robinson complained to Jackson about not being paid for all days he worked

in February:



> And my check is not right but I see it's a lot going on so I'll talk to you after you get done with everybody else

> K I'll look into tell which days u think?

> Ok

> You know I'm not tripping but I did 4 days and I rescued for a fact that week

> It's was like the 12th 14th 15th

145.  During the week of March 11, 2019, Robinson was not paid for several days of work.

146.  Robinson worked between 9 and 12 hours each day on March 11, 12, 13, and 16, 2019.

147.  Robinson was only paid for the work he performed on March 13, 2019.

148. On April 13, 2019, Jackson sent Robinson a text message in which he offered to pay Robinson a $75.00 bonus if he came into work on his scheduled day off:



149. From time to time during Robinson's employment, he was unable deliver packages to certain addresses due to safety issues; a bad address; or for other reasons.

150. Robinson did not fail to deliver packages frequently, and as a result, he was not disciplined when he failed to make certain deliveries.

151. Prior to May of 2019, Jackson regularly praised Robinson's work ethic, performance, and willingness to come in to work on short notice.

152. On May 15, 2019, two former Inpax Drivers filed a putative collective action alleging that Inpax Defendants and Wright had violated the FLSA based upon allegations that, *inter alia*, Defendants had failed to pay Drivers for all hours worked, resulting in sub-minimum wages and the non-payment of overtime. That case is stylized as *Scott Oberg, et al v. Inpax Shipping Solutions, Inc., et al*., N.D Ohio, No. 1:19-cv-01100 ("Oberg Litigation").

153. Robinson worked on May 24, 2019.

154. Upon arriving at work, Robinson's managers attempted to have Robinson sign an arbitration agreement that contained a class action waiver ("Arbitration Agreement").

155. Upon information and belief, Defendants foisted the Arbitration Agreement on Robinson and other Drivers as a means of heading off or preventing Drivers from eventually joining the Oberg Litigation.

156. Robinson refused to sign the Arbitration Agreement.

157. Robinson opted into the Robinson Litigation on May 24, 2019.

158. Robinson engaged in protected activity under the FLSA and the OMFWSA by joining the Oberg Litigation.

159. Robinson's consent to sue form was filed at approximately 10:30am on May 24, 2019.

160. Early during Robinson's shift on May 24, 2019, he encountered a situation in a high crime neighborhood in which he believed he was being followed by individuals Robinson was concerned may attempt to rob him ("Unsafe Delivery").

161. Robinson contacted Jackson and advised him that he did not feel safe on his route.

162. Jackson responded by instructing Robinson to skip deliveries that made him feel unsafe and to mark those packages as "no safe location":



163. Robinson also contacted Amazon for guidance about what to do concerning the Unsafe Delivery.

164. Amazon advised Robinson to mark the packages he was to deliver in connection with the Unsafe Delivery as "no safe location to deliver" and to move on to the next package.

165. Robinson flagged the packages he was to deliver in connection with the Unsafe Delivery as "no safe location to deliver."

166. Later in the evening on May 24, 2019, Jackson sent Robinson a text message in which he questioned Robinson's refusal to sign the arbitration agreement and attacked Robinson for failing to deliver the packages he was to deliver in connection with the Unsafe Delivery.

167. Jackson then suspended Robinson without pay because Robinson had allegedly "brought unattempted [sic] packages with different excuses now on 3 occasions saying that Amazon told you it was okay?"

168. Jackson's complaints about Robinson not delivering packages to an unsafe location was feigned and contrary to the very instructions Jackson had provided Robinson with earlier that day.

169. Jackson told Robinson he would not be put back on the schedule until Robinson provided Jackson with a written statement explaining why he did not deliver the packages he was to deliver in connection with the Unsafe Delivery.

170. Jackson further advised Robinson that he needed to go back to the area of the Unsafe Delivery and take pictures to submit along with his written statement.

171. Jackson further stated to Robinson by text message "Personally I am surprised over your attitude…if there is any other issues [sic] that are preventing you from being a great performer please let me know so I can assist."

20

172. Jackson's stated reason for suspending Robinson was in reality a pretext for retaliation against Robinson for opting into the Oberg litigation.

173. Jackson's suspension of Robinson's employment was an adverse action against Robinson.

174. Robinson responded to Jackson by complaining that he believed that Inpax Defendants and Jackson were retaliating against him for joining the Oberg Litigation.

175. Robinson asked that Jackson put him back on the schedule.

176. Jackson responded to Robinson by again insisting that Robinson submit a written statement along with photographs of the area in which the Unsafe Delivery was to occur.

177. Robinson responded to Jackson by stating that he would provide the emails he received from Amazon regarding the Unsafe Delivery and a written statement.

178. Robinson responded to Jackson by asking whether he would be paid for the time he spent travelling to the area in which the Unsafe Delivery was to occur and taking photographs since such activity would be for the benefit of Inpax and at Inpax's request.

179. Robinson objected to travelling to the area in which the Unsafe Delivery was to occur and taking photographs "off the clock."

180. Jackson responded to Robinson by instructing him to work off the clock by claiming that because Robinson left work at 3:30pm, he had "time left over":



181. On May 25, 2019, Robinson sent Jackson an email with his written statement but Robinson did not provide photographs.

182. Jackson allowed Robinson to return to work on May 27, 2019.

183. As a result of Jackson's suspension of Robinson, Robinson lost two days of wages.

184. During Robinson's shift on May 27, 2019, he had difficulties with his "Rabbit," an electronic device provided to Inpax drivers by Amazon to scan package deliveries.

185. Robinson notified an Inpax manager that his Rabbit was broken.

186. The manager responded to Robinson by offering him a bonus if he downloaded an app to his

phone that would allow Robinson to use his phone like he used the Rabbit:



187. On June 15, 2109, Robinson was promised a $50.00 bonus to come in on his day off and take

a route by another Inpax manager:

> Sat, Jun 15, 8:08 AM
>
> Hey man anyway you can come in
> and take a route 50 bonus on top of
> your route had 2 call offs

188. On June 30, 2019, Robinson was offered a $75.00 bonus by a manager named Isark to come

in on his day off:

> Sun, Jun 30, 7:30 AM
>
> Sheldon this isark can you come in
> and take a route today 75 bonus if
> you can had 4 call outs

189. On July 7, 2019, a manager named Mark offered Robinson a $75.00 bonus to come in and work on his day off:



Sun, Jul 7, 7:30 AM

Hey sheldon this is Mark can you come in and take a route today please sir

Extra 75 if you can come in

190. At all times referenced herein, Defendants would provide routes that had been scheduled to certain Drivers to others who were on "standby" if the Drivers who originally had the route were late.

191. Being late to work often meant being sent home.

192. On July 18, 2019, Robinson was scheduled to be at work at 7:30am.

193. On July 18, 2019, Robinson discovered that he had locked himself out of his car when he was preparing to leave for work.

194. Robinson could not initially call anyone about his situation because he had also left his cell phone in his car.

195. Robinson was able to get into his car by 8:17am.

196. Robinson attempted to call Inpax dispatch after he got into his car, but no one answered.

197. Seconds later, Robinson sent Jackson a text message explaining that he had been locked out of his car and given the time, would not be able to make it in.

198. Jackson called Robinson immediately after Robinson sent the text message.

199. Jackson terminated Robinson over the phone.

200. Jackson told Robinson that he had been "waiting for you to pull something like this"; that he was "sick of Drivers like you" and that Robinson "made it too easy."

201. Robinson had no history of discipline at Inpax prior to his termination other than his suspension in late May 2019.

202. Jackson's statements to Robinson confirm that Defendants terminated Robinson because Robinson had joined the Oberg Litigation and was using Robinson's call off as a pretext to justify the termination.

203. As a result of Defendants' unlawful conduct, Robinson has suffered and continues to suffer damages.

204. Robinson withdrew from the Oberg Litigation on October 15, 2020.

### COUNT I: FAILURE TO PAY OVERTIME IN VIOLATION OF THE FLSA
### (29 U.S.C. § 207).
### (Asserted By Martin and Robinson Against All Defendants).

205. Plaintiffs restate each and every prior paragraph of this Complaint, as if it were fully restated herein.

206. The FLSA requires each covered employer such as Inpax Defendants to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for all work performed in excess of 40 hours in a given work week.

207. Plaintiffs were not exempt from the right to receive overtime pay under the FLSA during their employment as Drivers with Inpax Defendants.

208. Plaintiffs are entitled to be paid overtime compensation for all overtime hours worked as Drivers.

209. Plaintiffs were not paid for all hours of work they performed, such as for Morning Work and for certain rescues they performed after returning to the Inpax hub.

210. Defendants willfully failed and refused to pay Plaintiffs overtime premium payments as required by the FLSA for all hours worked over 40 in a given week, causing Plaintiffs to suffer damage in amounts to be proven at trial.

211. Defendants willfully failed and refused to include all non-discretionary bonuses paid to Plaintiffs in the calculation of their overtime pay.

212. Defendants either recklessly failed to investigate whether their failure to pay Plaintiffs overtime for all of the hours they worked over 40 in a given week during the relevant time period violated the Federal Wage Laws of the United States, they intentionally misled Plaintiffs that Defendants were not required to pay them overtime for all hours worked over 40 in a given week, and/or Defendants concocted a scheme pursuant to which they deprived Plaintiffs of the overtime wages they earned.

213. Defendants have a history of violating the FLSA; have been cited by the Department of Labor for past violations of the FLSA; and are aware of their obligation to keep accurate time records of the hours worked by all non-exempt employees. Despite this history and knowledge, Defendants either failed to make, keep, and preserve accurate time records with respect to Plaintiffs or knowingly disregarded the information that was provided to them by managers in Euclid regarding the hours worked by Plaintiffs, in violation of the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 211(c) and § 215(a).

214. Defendants' conduct as alleged herein constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

215. Defendants violated the FLSA without a good faith belief that their conduct was lawful.

216. Plaintiffs are entitled to damages in the amount of their unpaid overtime compensation, plus liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and other such legal and equitable relief as the Court deems just and proper, including their attorneys' fees and costs.

**COUNT II: FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF THE FLSA**
**(29 U.S.C. § 207).**
**(Asserted By Robinson Only Against All Defendants).**

217. Robinson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

218. The FLSA requires each covered employer such as Inpax Defendants to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for work performed in excess of 40 hours in a work week.

219. Robinson was not exempt from the right to receive at least the minimum wage for all hours worked under 40 in a given week under the FLSA during his employment with Inpax Defendants.

220. Robinson is entitled to be paid at least the minimum wage for all hours he worked under 40 in a given week.

221. By failing to pay Robinson for hours and even entire days he worked, Robinson's regular rate of pay sometimes fell below the minimum wage.

222. Defendants willfully failed and refused to pay Robinson for all hours and days he worked.

223. Defendants have a history of violating the FLSA; have been cited by the Department of Labor for past violations of the FLSA; and are aware of their obligation to keep accurate time records of the hours worked by all non-exempt employees. Despite this history and knowledge, Defendants either failed to make, keep, and preserve accurate time records with respect to Robinson or knowingly disregarded the information that was provided to them by

managers in Euclid regarding the hours worked by Robinson, in violation of the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 211(c) and § 215(a).

224. Defendants' conduct as alleged herein constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

225. Defendants violated the FLSA without a good faith belief that their conduct was lawful.

226. Robinson is entitled to damages in the amount of their unpaid overtime compensation, plus liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and other such legal and equitable relief as the Court deems just and proper, including their attorneys' fees and costs.

## COUNT III: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.03, et seq, BASED ON FAILURE TO PAY OVERTIME. (Asserted By Martin and Robinson Against All Defendants).

227. Plaintiffs restate each and every prior paragraph of this Complaint, as if it were fully restated herein.

228. Defendants have been, and continue to be, "employers" within the meaning of the OMFWSA.

229. During all times material to this Complaint, Defendants have employed "employees" within the meaning the OMFWSA.

230. During all times material to this Complaint, Plaintiffs were employees of Defendants as that term is defined by the OMFWSA.

231. Ohio R.C. § 4111.03 provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the [FLSA]…"

232. Defendants failed to pay Plaintiffs overtime for all hours they worked in excess of 40 per week.

233. In denying Plaintiffs overtime compensation, Defendants violated the OMFWSA and Article II, Section 34a of the Ohio Constitution.

234. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered and will continue to suffer a loss of income and other damages.

235. Having violated the OMFWSA, Defendants are joint and severally liable to Plaintiffs pursuant to O.R.C. § 4111.10 for the full amount of their unpaid overtime and for costs and reasonable attorneys' fees.

### COUNT IV: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.03, et seq, BASED ON FAILURE TO PAY MINIMUM WAGE. (Asserted By Robinson Only Against All Defendants).

236. Robinson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

237. Defendants have been, and continue to be, "employers" within the meaning of the OMFWSA.

238. During all times material to this Complaint, Defendants employed "employees," within the meaning the OMFWSA.

239. During all times material to this Complaint, Robinson was an employee of Defendants as that term is defined by the OMFWSA.

240. In 2018, the OMFWSA required employers to pay a minimum wage of at least $8.30 per hour to all non-exempt employees.

241. Robinson's regular rate of pay sometimes fell below $8.30 per hour in 2018 due to Defendants' failure to pay Robinson for all hours and all days worked.

242. In 2019, the OMFWSA required employers to pay a minimum wage of at least $8.55 per hour to all non-exempt employees.

243. Robinson's regular rate of pay sometimes fell below $8.55 per hour in 2019 due to Defendants' failure to pay Robinson for all hours and all days worked.

244. In denying compensation at the requisite Ohio minimum wage rate, Defendants violated the OMFWSA and Article II, Section 34a of the Ohio Constitution.

245. Defendants have failed to make, keep, and preserve records with respect to Robinson, sufficient to determine the wages and other conditions and practices of employment in violation of the OMFWSA, R.C. § 4111.08, et seq.

246. Having violated the OMFWSA, Defendants are liable to Robinson pursuant to O.R.C. § 4111.10 for the full amount of his unpaid wages and for costs and reasonable attorneys' fees. Additionally, Defendant is liable to Robinson for an amount equal to twice her unpaid wages. O.R.C. § 4111.14(J).

### COUNT V: VIOLATION OF THE OHIO PROMPT PAY ACT, O.R.C § 4113.15 (Asserted By Martin and Robinson Against Inpax Defendants Only).

247. Plaintiffs restate each and every prior paragraph of this Complaint, as if it were fully restated herein.

248. During all times material to this complaint, Inpax Defendants were covered by the Ohio Prompt Payment Act, R.C. § 4113.15 ("OPPA") and Plaintiffs were employed by Inpax Defendants within the meaning of OPPA.

249. The OPPA required Inpax Defendants to pay Plaintiffs all wages earned, including unpaid minimum wages and overtime wages, on or before the first day of each month, for wages earned by Plaintiffs during the first half of the preceding month ending with the fifteenth day

thereof, and on or before the fifteenth day of the month, for wages earned by Plaintiffs during the last half of the preceding calendar month. *See* O.R.C. § 4113.15(A).

250. At the conclusion of Martin's term of employment with Inpax Defendants, Martin was not paid all overtime wages due within 30 days of performing the work, after she requested said payment. *See* O.R.C.§ 4113.15(B).

251. At the conclusion of Robinson's term of employment with Inpax Defendants, Robinson was not paid all overtime wages and minimum wages due within 30 days of performing the work, after he requested said payment. *See* O.R.C.§ 4113.15(B).

252. Plaintiffs' unpaid wages remain unpaid for more than thirty (30) days beyond their regularly scheduled paydays.

253. In violating the OPPA, Defendant acted willfully, without a good faith basis and with reckless disregard of clearly applicable Ohio law.

**COUNT VI: RETALIATION BASED ON PROTECTED WAGE COMPLAINTS IN VIOLATION OF ARTICLE II, SECTION 34A OF THE OHIO CONSTITUTION. (Asserted By Martin Only Against All Defendants).**

251. Martin incorporates by reference the allegations in the preceding paragraphs.

252. Pursuant to Article II, Section 34a of the Ohio Constitution, "[n]o employer shall discharge or in any other manner discriminate or retaliate against an employee for exercising any right under this section or any law or regulation implementing its provisions or against any person for providing assistance to an employee or information regarding the same."

253. Martin was terminated by Defendants because she made protected complaints regarding Defendants' failure to pay her and other Inpax employees all wages due.

254. Defendants' termination of Martin constitutes a retaliatory adverse action against Martin in violation of Article II, Section 34a of the Ohio Constitution.

255. By reason of the foregoing acts of Defendants, Martin has suffered economic damages and has suffered from emotional distress.

256. Pursuant to Ohio R.C. §4111.14(J), Martin is entitled to "an amount set by the state or court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued."

## COUNT VII: VIOLATION OF 29 U.S.C. § 215(A)(3) - UNLAWFUL RETALITION IN VIOLATION OF THE FLSA.
### (Asserted By Martin Only Against All Defendants).

257. Martin restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

258. The FLSA, at 29 U.S.C. § 215(a)(3), makes it unlawful for an employer to retaliate against an employee who seeks to enforce his rights under the FLSA.

259. Martin was terminated because he made protected complaints under the FLSA.

260. Defendants violated 29 U.S.C. § 215(a)(3) of the FLSA and showed reckless disregard of the provisions of the FLSA concerning retaliation by taking adverse actions against Martin because he made protected complaints under the FLSA.

261. By reason of the foregoing acts of Defendants, Martin has suffered damages, including lost income. Martin is entitled to recover liquidated damages for these damages pursuant to the Fair Labor Standards Act.

262. Martin requests recovery of his attorney's fees and costs associated with this cause of action as provided by 29 U.S.C. § 216(b).

**COUNT VIII: RETALIATION BASED ON PROTECTED WAGE COMPLAINTS IN VIOLATION OF ARTICLE II, SECTION 34A OF THE OHIO CONSTITUTION.
(Asserted By Robinson Only Against Inpax Defendants and Jackson Only).**

263. Robinson restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

264. Pursuant to Article II, Section 34a of the Ohio Constitution, "[n]o employer shall discharge or in any other manner discriminate or retaliate against an employee for exercising any right under this section or any law or regulation implementing its provisions or against any person for providing assistance to an employee or information regarding the same."

265. Martin was terminated by Defendants because she made protected complaints regarding Defendants' failure to pay her and other Inpax employees all wages due.

266. Defendants' termination of Martin constitutes a retaliatory adverse action against Martin in violation of Article II, Section 34a of the Ohio Constitution.

267. By reason of the foregoing acts of Defendants, Martin has suffered economic damages and has suffered from emotional distress.

268. Pursuant to Ohio R.C. §4111.14(J), Martin is entitled to "an amount set by the state or court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued."

**COUNT IX: VIOLATION OF 29 U.S.C. § 215(A)(3) - UNLAWFUL RETALITION IN VIOLATION OF THE FLSA.
(Asserted By Robinson Only Against Inpax Defendants and Jackson Only).**

269. Robinson restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

270. The FLSA, at 29 U.S.C. § 215(a)(3), makes it unlawful for an employer to retaliate against an employee who seeks to enforce his rights under the FLSA.

271. Robinson was terminated because he joined the Oberg Litigation and asserted claims against Inpax for failing to pay overtime.

272. Inpax Defendants and Jackson violated 29 U.S.C. § 215(a)(3) of the FLSA and showed reckless disregard of the provisions of the FLSA concerning retaliation by taking adverse actions against Robinson because he made protected complaints under the FLSA.

273. By reason of the foregoing acts of Inpax Defendants and Jackson, Robinson has suffered damages, including lost income. Robinson is entitled to recover liquidated damages for these damages pursuant to the Fair Labor Standards Act.

274. Robinson requests recovery of his attorney's fees and costs associated with this cause of action as provided by 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Melisa Martin and Sheldon Robinson respectfully request relief against Defendants as set forth below:

a. Issuing a declaratory judgment that the practices complained of herein are unlawful under the FLSA, 29 U.S.C. §§ 201 *et seq;* the OMFWSA; and the Section 34a, Article II, Ohio Constitution;

b. Issuing a declaratory judgment that Defendants violated the recording-keeping requirements of the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 211(c), § 215(a), and the OMWFSA, R.C. § 4111.08;

c. Awarding Plaintiffs the unpaid minimum wages and unpaid overtime wages they are owed and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b) and O.R.C § 4111.14(J);

d. Awarding Plaintiffs damages for the emotional distress caused by Defendants' unlawful retaliatory conduct in addition to an amount of at least $150.00 per day since Plaintiffs respective unlawful terminations pursuant to Ohio R.C § 4111.14(J);

e. Pursuant to O.R.C § 4113.15, awarding Plaintiffs the greater of $200.00 or six percent interest on the unpaid minimum wages and overtime due to them;

f. Awarding pre-judgment and post-judgment interest as provided by law;

g.  Awarding Plaintiffs their reasonable attorneys' fees and costs; and

h.  Awarding such other and further relief that this Court deems appropriate.

Respectfully submitted,

*/s/ Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744

Email:  chris.wido@spitzlawfirm.com

*Attorney for Plaintiffs Melisa Martin and*
*Sheldon Robinson, Jr.*

## <u>JURY DEMAND</u>

Plaintiffs Melisa Martin and Sheldon Robinson, Jr demand a trial by jury by the maximum number of jurors permitted.

*/s/ Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
